IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. ___20-MJ-955 |
| | ) | |
| vs. | ) | |
| | ) | |
| **CHARLES BRENT JUSTICE,** | ) | |
| | ) | |
| Defendant. | ) | |

MOTION TO DETAIN DEFENDANT PENDING TRIAL

The United States respectfully submits this motion to detain the defendant, CHARLES BRENT JUSTICE (hereinafter, "Defendant"), pending trial on the indictment. *See* 18 U.S.C. § 3142. Defendant is an airman in the United States Air Force (USAF). Using knowledge and training entrusted to him in his position in the Air Force, Justice illegally imported from China one or more silencers, designed to muffle the sound of a gunshot. There is no legal application for his actions. Silencers are used to help individuals murder others without the detection which might otherwise result from the sound of a gunshot. Defendant also ordered other gun parts, including a part which converts a Glock into full automatic firing mode (also illegal), without seeking the required permission from the Air Force. Additionally, Defendant had 17 firearms stored at his residence that he had failed to register with the USAF. A search of Defendant's cell phone uncovered shocking material suggesting a pre-disposition to commit a violent act. Under these circumstances, Defendant poses a risk of flight and danger to the community that this Court cannot mitigate with any conditions of release – no matter how restrictive. See 18 U.S.C. §

3142(e). This Court should therefore order Defendant remanded to the custody of the U.S. Marshals Service pending trial.

      I.      <u>RELEVANT FACTS AND PROCEDURAL HISTORY</u>

          A.      Defendant has served in the United States Air Force since 2015. As part of both basic training and Security Forces technical school, he underwent multiple firearms trainings, to include automatic rifles and pistols. Consequently, Defendant obtained proficiency in multiple weapons and passed various tests designed to increase his combat readiness. At Kirtland Air Force Base (KAFB), training includes heavy weaponry, anti-personnel weaponry, driving military vehicles, and intruder deterrence and apprehension. KAFB additionally provided Defendant classified training to protect highly secured military assets located on base. As a member of the Weapons Systems Security Squadron, Defendant has received training above and beyond that of a typical Air Force member. Defendant's extensive and specialized training in multiple weapons, combat techniques and tactics, combined with his interest and expertise in firearms, indicate a far greater capacity to cause serious harm than that of an average citizen. As discussed more fully below, Defendant's recent activities demonstrate his imminent interest in utilizing that capacity for harm.

          B.      Charged Offenses

The charges in the Complaint stem from conduct that occurred at Kirtland Air Force Base while Defendant was a member of the United States Air Force. The FBI/ATF began investigating Defendant in early 2020 after Homeland Security Investigations and Customs and Border Protection agents learned that Defendant had ordered an illegal silencer and other illegal firearms parts from China, in violation of 26 U.S.C. 5861(d) Possession of an unregistered NFA weapon (silencer) and 18 USC 922(l) Unlawful Importation of a Firearm.

II.     APPLICABLE LAW

A defendant charged with a criminal offense is entitled to a hearing before a magistrate judge on the issue of his or her pre-trial detention. *See* 18 U.S.C. §§ 3142(f). At such a hearing, the magistrate judge must consider "(1) the nature and circumstances of the offense charged[;] … (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including … [the defendant's] criminal history … and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

At a detention hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence and proving dangerousness by clear-and-convincing evidence. 18 U.S.C. § 3142(f); *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003). The ultimate "burden of persuasion … always remains with the [United States]." *United States v. Stricklin*, 932 F.2d 1353, 1354 (10th Cir. 1991).

At the completion of the detention hearing, the magistrate judge shall issue a detention order, pursuant to 18 U.S.C. § 3142(i), when "the jud[ge] finds that no … conditions [of release] will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). However, the magistrate judge may release the defendant from custody when the defendant's risk of flight and danger to the community can be adequately mitigated. *United States v. Bustamante-Conchas*, 577 Fed. Appx. 803, 805 (10th Cir. 2014).

III.     ARGUMENT FOR DETENTION

This Court should remand Defendant to the custody of the U.S. Marshals pending trial. Defendant poses a very serious risk that he has the knowledge and motivation to flee the country in order to avoid prosecution and imprisonment for his crimes.  Defendant poses an extreme danger to the community given his extensive weapons training and plans to possess multiple illegal weapons.  Given Defendant's training with weapons and combat techniques, coupled with the disturbing images stored on his phone, there are no conditions of pretrial release that would adequately mitigate Defendant's extreme flight risk and dangerousness.  The prosecution addresses each of the four factors supporting detention in further detail below.

A.     Nature and Circumstances of the Offense

The criminal complaint articulates facts which indicate Defendant's intentions were dangerous: he attempted to import illegal weapons, to wit, a silencer whose sole purposes is to escape detection when shooting someone, as well as parts designed to illegally convert a Glock pistol into a fully automatic machine gun.  Defendant faces up to 10 years incarceration if convicted.  See 26 U.S.C. § 5871.   Naturally, the probability of such a long term of imprisonment gives Defendant a powerful incentive to flee.  *See United States v. Munoz-Hernandez*, No. CR 12-0128 JB, 2012 U.S. Dist. LEXIS 161970, at *31-32 (D.N.M. Nov. 5, 2012)(Browning, J.)(noting that "[i]n the face of such a lengthy term of imprisonment [10 years to life], and the evidence against him, [the defendant] might be tempted to flee . . . rather than spend a good portion of his life in an American prison").  Defendant's violations of law, coupled with the anti-police and anti-government materials seized from his phone show Defendant does not respect lawful authority and will not hesitate to violate this Court's orders on any condition

<pre>
</pre>
<pre>
</pre>
<pre>
</pre>
<pre>
</pre>
<pre>
</pre>

of release. The nature and surrounding circumstances of the charged offenses provide very compelling reasons to remand Defendant to the custody of the U.S. Marshals pending trial.

        B.        Weight of the Evidence

The evidence supporting the indictment is strong. Defendant attempted to ship illegal firearms parts to himself via a Chinese website. The United States Air Force Office of Special Investigations (OSI) determined that Justice had received shipments of at least two (2) other illegal items from Chinese vendors. These items include a "butt-stock" designed to turn a Glock pistol into a short-barreled rifle, along with a Glock compatible "auto-sear," which is a combination of parts designed to covert a semi-automatic firearm into a fully automatic firearm, allowing it function as a machine gun. As indicated above, Defendant has received countless hours of taxpayer-funded training in methods and techniques of combat and weapons. He is assigned to the Weapons Systems Security Squadron, which is a unit of the KAFB Security Forces Group. These groups are responsible for base security as well as providing security for nuclear and non-nuclear materials and support operations. In the hands of someone with Defendant's training, the illegal weapons described above present a very real danger to the community.

Collectively, the serious nature and circumstances of the charges and the strength of the evidence would almost certainly cause Defendant to flee unless he is detained pending trial. Indeed, the proximity of New Mexico to the southern border of the United States greatly enhances Defendant's flight risk. *Munoz-Hernandez*, 2012 U.S. Dist. LEXIS 161970, at *31-32 ("[t]he fact that New Mexico runs along the Mexican border increases the risk of flight to Mexico" and "decreases the ability of law enforcement officers to timely respond to a

defendant's flight, even if the Court were to require [Defendant] to wear a GPS device during his release.").

A search of Defendant's cell phone yielded dozens of disturbing images, as well as the complete manifesto of Brenton Tarrant, the man charged with 51 murders, 40 attempted murders, and engaging in a terrorist act in the Christchurch. New Zealand shootings at a mosque on March 15, 2019.  Copies of the materials from Defendants phone are attached as Exhibits A, B, and C.

    i.   **Exhibit A**

Exhibit A contains 43 different photographs (there are 44 files, the first one being a caption by the USAF OSI officer who collected the evidence).  Among them:

1. Page 2 is a photograph of a "butt stock" like the one discovered at Defendant's home, with the words "You can't shake the taste of blood."
2. Page 3 is a photograph of a person standing next to a truck full of weapons and ammo, next to a photograph of a machine gun and some apparent marijuana;
3. Page 4 shows an individual preparing to fire a rifle with a silencer, next to a photo of the license plate of an active duty Special Agent with KAFB Office of Special Investigations;
4. Page 5 shows the same license plate along with a coffee cup with an unknown substance;
5. Pages 6-9 are schematics for conversion of a firearm to full automatic mode;
6. Page 12, 13 shows silencer assemblies and a firearm part ready for full auto conversion;

7. Page 15 shows a picture of a person modifying a gun on top, and a diagram of an "L-shaped ambush formation," which is a military maneuver designed to prevent an enemy from escaping a "kill zone." Next to the gun modification are the words "What I appear to be doing." Next to the ambush diagram are the words "what I am actually doing." The implication seems to be that the author is preparing for an attack, whilst disguising his/her actions as routine. Next to both photos is a depiction of various "fringe" groups, with the words "hating police."

8. Page 17 depicts AR15 magazines with the names of active shooters painted on them. The New Zealand shooter, Brenton Tarrant, scrawled these same names on the magazines he used when he shot his victims in 2019, and he posted the pictures to Twitter.

9. Page 19 is more silencer photos with a firearm.

10. Page 20 is a diagram of a firearm for full auto conversion with a picture mocking the Uniform Code of Military Justice (UCMJ). The caption in the picture reads "We can't do that, it's against the UCMJ" with a response "Thats why no-one will remember your name." The inference is that strict adherence to the UCMJ shows a lack of guts or vision.

11. Page 23 is racist propaganda. One half of the picture mocks African Americans, and the other half takes aim at Muslims.

12. Multiple pages from 24-43 depict schematics for constructing Improvised Explosive Devices (IEDs), which are essentially homemade bombs, including Molotov cocktails.

13. Page 25 also contains a picture making light of suicides within the military

14. Page 29 references the Christchurch shootings.

15. Page 44 contains a picture which reads "My family claiming how sweet I am" next to the words "Me knowing I'm on a few watchlists and will be labeled a domestic terrorist soon."

    ii.    **Exhibit B**

Exhibit B is instructions for making a homemade silencer.

    iii.    **Exhibit C**

Exhibit C is the Manifesto of the New Zealand shooter, Brenton Tarrant.

    C.    Defendant's Criminal History

Defendant has no known criminal history, however he was officially reprimanded by the United States Air Force for attempting steal gun supplies and ammunition in 2016. Although this is not a particularly serious charge, it demonstrates Defendant's willingness to ignore the law, even for petty matters.[1]

    D.    Danger to the Community

There is clear and convincing evidence that Defendant poses an extreme danger to the community. His training and experience, the fact that he illegally tried to import a silencer and parts to convert a gun to a machine gun, the 17 unregistered firearms and 3,000 rounds of ammunition found at his residence,[2] and the disturbing content on his phone are indicative of a man with a plan, who appears to be stockpiling weapons and ammunition. The photos and

---

[1] See Exhibit E, a letter of counseling sent to Defendant after he failed to wear his beret after being told to do so on a previous occasion. His lengthy diatribe in response reveals barely-concealed rage that mirrors some of the anti-authority sentiments contained in the files saved on his phone.
[2] See Exhibit F, photos from execution of search of Defendant's residence.

documents on his phone reveal his anti-government and police leanings, to say nothing of the additional bigoted materials, which by themselves cause serious concerns.

The Department of the Air Force reviewed this matter for the possibility of confining Defendant on February 26. The Memorandum of this review is attached as Exhibit D. The Pretrial Confinement Officer is not a judge or an attorney. He found statements from friends and family members to be persuasive in releasing Defendant. As opposed to his friends and family members, several of Defendant's coworkers expressed concern.

1. When Air Force OSI agents interviewed Defendant, he wrote notes on the back of a card. The notes "identified SA Sorenson as the lead investigator and an arrow was pointed towards SA Sorenson's name. SA Sorenson interpreted this arrow as an indicator (Defendant) may retaliate against him. The note card also contained the statement ".50 cal?"
2. A former flight chief who supervised Defendant recommended "staff arming" around Defendant, which means people who would be around him but were not typically armed, would now be armed. The same flight chief also stated he believed Defendant would retaliate (against the flight chief).
3. Another coworker told investigators he saw a .50 caliber rifle in Defendant's vehicle and that Defendant admitted it was his. The coworker provided a signed statement to that effect. Defendant later told investigators he never had a .50, but instead merely had empty casings he intended to fashion into jewelry.
4. Defendant is known to keep a notebook listing favorable and unfavorable actions of coworkers. At least one coworker felt the notebook presented a potential threat to his

safety, i.e., that Defendant might retaliate against those he believed had done him wrong.

5. The same coworker initially told investigators he did not feel Defendant was a danger, but changed his mind when he learned Defendant had purchased silencers.

6. Lt. Col. Chamberlin, Commander of Defendant's Squadron, believes there is a greater than 50% chance Defendant is a flight risk, given the nature of the offense, and also that there is a greater than 50% chance Defendant will commit other serious crimes.

7. The First Sergeant of Defendant's Squadron believes there is a greater than 50% chance Defendant will commit serious criminal misconduct if released, and is concerned Defendant will harm others.

There are also statements, as indicated, from friends and family of Defendant, which are supportive and contain statements discouraging any conclusion that he is dangerous. However, the photos and documents on Defendant's phone, with the diagrams for making explosives, anti-government and anti-police statements, racist propaganda, etc., were not known to any of the individuals who provided statements for the Pretrial Confinement Review. Furthermore, this Court should give greater weight to the statements of Defendant's commanding officers, who believe he presents a greater than 50% risk of harm to the community, and one of whom believes there is a greater than 50% likelihood he will attempt to escae prosecution.

A halfway house is also entirely unsuitable for Defendant. Defendant has shown a desire to inflict violent harm on others. He has been trained in many techniques he could use to escape the halfway house and injure others to do so if needed. The halfway house also generally permits residents to possess wireless phones (including those with internet access) and it is unreasonable to believe Defendant could not gain access to a cell phone at the halfway house if

he was determined to do so.  Given the contents of his cell phone referenced here, this would present a dangerous situation.

    IV.    <u>CONCLUSION</u>

The applicable factors discussed above should persuade this Court that Defendant must be detained pending trial.  Clearly, there are "no . . . conditions [of release that] will" mitigate the risk of flight and extraordinary dangerousness posed by Defendant and "reasonably assure the appearance of [Defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).  Under these circumstances, this Court should remand Defendant to the custody of the U.S. Marshals pending trial on the indictment.

WHEREFORE, the United States requests that this Court grant this motion to detain.

                                                   Respectfully Submitted,

                                                   JOHN C. ANDERSON
                                                   United States Attorney

                                                   _/s/_____
                                                   JON K. STANFORD
                                                   Assistant United States Attorneys